UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Ernest Pagan,<br>    *Plaintiff,* | Civil No. 3:10cv155 (JBA) |
| *v.* | |
| Clarence Willoughby, Reginald Sutton, Francisco<br>Ortiz, and the City of New Haven,<br>    *Defendants.* | July 23, 2012 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

On February 1, 2010, Plaintiff Ernest Pagan filed a Complaint against Defendant

New Haven Police Officers Detective Clarence Willoughby, Detective Reginald Sutton, and

former Chief of Police Francisco Ortiz, as well as the City of New Haven ("City"), claiming

that Defendants Sutton and Willoughby violated his Fourth and Fourteenth Amendment

rights to be free from unreasonable seizure, false arrest, and malicious prosecution by

submitting an arrest warrant with false statements obtained from witnesses through coercion

(Count One), his Due Process rights during the course of his arrest (Count Two), and his

Fourth and Fourteenth Amendment right to be free from unwarranted seizures and his right

to a fair trial by falsifying information and forwarding it to prosecutors (Count Three); that

the City violated his Fourth, Fifth, and Fourteenth Amendment rights by failing to provide

adequate training and supervision (Count Four) and through deliberate indifference to the

coercive practices of its police officers (Count Five); and that Defendant Ortiz failed to

provide adequate supervision of Defendants Willoughby and Sutton and failed to intercede

to prevent the violations of Plaintiff's constitutional rights (Count Six).[1]  Defendants

_____

[1] Plaintiff moves [Doc. # 82] to withdraw Count Two of the Complaint, which
Defendants do not oppose.  Plaintiff's motion to withdraw is granted, and Count Two is

Willoughby [Doc. # 74], Ortiz [Doc. # 75], Sutton [Doc. # 76], and the City of New Haven [Doc. # 77] move for summary judgment on Plaintiff's remaining claims. For the reasons that follow, Defendants Willoughby's and Sutton's motions will be denied, and the City's and Chief Ortiz's motions will be granted.

I.      Relevant Undisputed Facts

        A.      The Shooting

        On December 24, 2006 at 1:17 a.m., two men were shot in the area of 335 Whalley Avenue. (Dispatch Record, Ex. B to Sutton's Loc. R. 56(a)1 Stmt.) An Incident Report prepared by Detective Breland states that in the early morning of December 24, 2006, he was on duty in the parking lot of Newt's Café on Whalley Avenue and was called into the club by the owner, Ernest Newton. (Breland Report, Ex. C to Sutton's 56(a)1 Stmt at 1.) When he was inside Newt's, he heard five loud bangs that he believed to be gun shots. (*Id.*) Detective Breland went outside and saw two men on the ground with gunshot wounds, identified as Tony Howell and James Brown. (*Id.* at 1–2.) Tony Howell later died of his wounds. Detective Breland stated in his report that after he asked if anyone saw the shooting, only one woman, "Danella Adams," answered that she did; she identified that shooter "as a dark complex[]ion tall black male with a dread hair style." (*Id.* at 2.)

        Detective Sutton was assigned as the lead detective on the case, and Detective Willoughby was also assigned to the case. (Sutton Dep., Ex. F to Sutton 56(a)1 Stmt at 25:16–26:16; Willoughby Dep., Ex. A to Willoughby's Loc. R. 56(a)1 Stmt at 37:2–18.)

_____

dismissed. The Court therefore does not address Defendants' arguments with respect to summary judgment on Count Two.

B.     The Investigation

Detective Sutton states in his Case Incident Report: "During the course of this investigation the rumors began to surface on the street that the subject responsible for the shooting at Newts was called . . . Mooley–Ron and that he was from the Westville/Rockview Circle area of the city." (Sutton Report, Ex. G to Sutton's 56(a)1 Stmt at 2.)  The Incident Report further states that Lieutenant White of the narcotic unit informed Sutton that he had learned through a confidential information that Ernest Pagan, the Plaintiff, went by the name Mooley–Ron, and that a recent photo of Mr. Pagan matched the description given to Detective Breland at the scene of the shooting.  (*Id.*)

1.     *Rodrigo Ramirez*

In his Report, Detective Sutton states that on December 26th, he "was made aware" that a subject in police custody on domestic violence charges, Rodrigo Ramirez, told officers that he had information about the shooting at Newt's. (*Id.*)  Mr. Ramirez, however, testified at a March 3, 2008 *Franks* hearing in connection with Mr. Pagan's criminal case that after his arrest, he first wanted to talk to detectives about a separate murder that took place on Sherman Avenue, and only after he mentioned that he had been at Newt's on the night of the shooting did Detectives Sutton and Willoughby arrive to talk to him. (*Franks* Trans., Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt at 100:21–102:10.)  Detective Sutton wrote in his Report that Ramirez stated that he had known Mr. Pagan for ten years and that he was outside Newt's Café at the time of the shooting. (Sutton Report at 2.)  According to Detective Sutton, Mr. Ramirez was shown a photo board of eight black male subjects, identified Mr. Pagan's photograph as the person he saw shoot Tony Howell and James Brown, and dated and signed the photo board. (*Id.*)

Mr. Ramirez then gave a taped statement to Detectives Sutton and Willoughby in which he stated that he was giving the statement voluntarily and during which he again identified Mr. Pagan's photo on the photo boards as an image of the shooter.  (Ramirez Stmt, Ex. M to Sutton's 56(a)1 Stmt at 2, 4.)  He further stated that he had known Mr. Pagan for "ten years or more" and that Mr. Pagan was his "sister baby father brother."  (*Id.* at 4–5.)

During his testimony at the March 3, 2008 *Franks* hearing, however, Mr. Ramirez testified that during his conversation with Detectives Sutton and Willoughby, "the detective" told him "that was the person that did it and sign right there." (*Franks* Trans. at 48:11–20.) He further testified that he dated and signed the photograph of Mr. Pagan because the detective "picked it for me." (*Id.* at 48:21–49:2.) Mr. Ramirez also claimed that when he was asked on the tape if he was giving the statement voluntarily and when he identified Mr. Pagan's photograph on the tape, the detectives asked those questions and then stopped the tape to tell him how to answer before then starting the recording again.  (*Id.* at 50:14–21, 53:14–18.)  He later testified a second time that he identified Mr. Pagan as the shooter on the tape because the detective told him to "say yes," but when asked if he told the detectives the truth stated: "I did tell them the truth." (*Id.* at 56:5–15.)  Mr. Ramirez then repeated that he told the detectives that he saw Mr. Pagan shooting because he was told to say "yes," and that the detective kept stopping the tape: "When I didn't want to answer he stopped it and he would tell me what to say and press play, rewind it, and press play." (*Id.* at 58:4–11, 60:18–27.)  He testified that he only said that Mr. Pagan was the shooter because the police told him to say it.  (*Id.* at 61:1–7.)

Mr. Ramirez claimed that the detective turned the tape off and on seven or eight times.  (*Id.* at 76:10–19.)  He also claimed that the detectives spoke with him for between

4

three and five hours before he gave his taped statement. (*Id.* at 102:13–19.) Mr. Ramirez testified that during that time, Detective Willoughby "pressured" him to give a statement that Mr. Pagan was the shooter and "wouldn't even let me leave out of the room." (*Id.* at 103:24–104:19.) He claimed at the *Franks* hearing that he did not see who the shooter was, but said that it was Mr. Pagan in his sworn statement because that was what Detective Willoughby asked him to say. (*Id.* at 105:22–26.)

### 2.   *Danielle Adams*

Detective Sutton states in his Report that on December 28, 2006, he and Detective Willoughby went to Danielle Adams' house, showed her a photo board of eight black males, and that she identified Mr. Pagan "as the person she saw shoot James Brown Jr. and Tony Howell outside of Newt's Café." (Sutton Report at 3.) Ms. Adams then gave a taped statement to Detectives Sutton and Willoughby, in which she confirmed that she identified Mr. Pagan on the photo board as the shooter. (Adams Stmt, Ex. N to Sutton's 56(a)1 Stmt at 2–3.) At the March 3, 2008 *Franks* hearing, Ms. Adams testified that when Detective Willoughby showed her the eight photographs he said: "Baby girl, I've traveled the world. I know you know who did it. I traveled the world. It was the particular photo, that one, with the eight in there. And I know you're looking to the left." (*Franks* Trans., Ex. 2 to Pl.'s 56(a)2 Stmt at 38:9–21.)

### 3.   *Michael Anderson*

According to Detective Sutton's Report, he and Detective Willoughby met with Michael Anderson at his home after leaving the interview with Danielle Adams. (Sutton Report at 3.) Detective Sutton writes in the Report that Anderson stated that he was outside Newt's on December 26, and that he described the shooter "as a dark skinned black male

with dreads." (*Id.*)  As with Mr. Ramirez and Ms. Adams, Detective Sutton states that Mr. Anderson identified Mr. Pagan as the shooter on a photo board containing eight black male subjects.  (*Id.*)  Mr. Anderson also gave a taped statement, in which he again identified Mr. Pagan's photo as a photo of the shooter.  (Anderson Stmt, Ex. O to Sutton's 56(a)1 Stmt at 4–5.)

During the March 3, 2008 *Franks* hearing, Mr. Anderson testified that despite his statement and identification of the photo of Mr. Pagan, he never saw the shooter's face and only signed the photo of Mr. Pagan because Detective Willoughby kept telling him that Mr. Pagan was the shooter.  (*Franks* Trans., Ex. 3 to Pl.'s 56(a)2 Stmt at 123:15–25, 125:2–8, 128:4–130:7.)  Mr. Anderson further testified that during his meeting with the detectives, Detective Willoughby "kept saying you know you seen it, kept harassing me, like he kept going over and over the same thing." (*Id.* at 143:22–144:1.)

On March 10, 2008, at Mr. Pagan's trial, Mr. Anderson repeated that he never saw the shooter's face on December 24, 2006, and that he told Detectives Sutton and Willoughby that he couldn't identify the shooter because he never saw his face.  (Trial Tr., Ex. 5 to Pl.'s 56(a)2 Stmt at 146:15–23, 169:3–6.)  He testified that he signed the photo of Mr. Pagan on the photo board because Detective Willoughby told him that Mr. Pagan was "the person who did it."  (*Id.* at 142:24–26, 145:14–17, 146:24–147:2.)  Mr. Anderson testified that he asked Detective Willoughby how he knew Mr. Pagan was the shooter, and Detective Willoughby answered that "he got it from somebody else who told him."  (*Id.* at 162:20–163:3.)  According to Mr. Anderson, prior to his taped statement, the detectives "were harassing" him, that the harassment went on "[t]oo long for them to be at my house, to tell you the truth," that Detective Willoughby pointed to Mr. Pagan's photo and said that he was the

6

person who did it because he "must have got tired waiting around and waiting around," and that Mr. Anderson agreed in his taped statement that he was able to identify the shooter "[t]o get rid of them because they kept harassing me, I tell them yes to get them out of my house, out of my house." (*Id.* at 158:21–159:18, 166:9–15.)

### 4.   *Jamie Walker*

In the Incident Report, Detective Sutton writes that on December 28, 2006, he and Detective Willoughby interviewed Tony Howell's fiancée, Jamie Walker. (Sutton Report at 3.)   According to the Report, Ms. Walker stated that she was at Newt's the night of the shooting, that prior to the shooting she saw James Brown "in a heated argument on the dance floor with a subject known to her as Loc," and that Loc and Mr. Pagan "were the best of friends." (*Id.* at 3–4.)   The Report also includes that Walker stated that Pagan "would do anything for Loc including shooting somebody," but that she did not see Pagan "inside or outside the club on the night of the incident." (*Id.* at 4.)   On March 12, 2008, Ms. Walker testified at Mr. Pagan's trial that she did not see the shooting, and that Mr. Pagan was not at Newt's on the night of the shooting. (Trial Tr., Ex. 4 to Pl.'s 56(a)2 Stmt at 18:25–27, 24:9–19, 27:15–16.) She further testified that she told Detectives Willoughby and Sutton that Mr. Pagan was not at Newt's on December 24, 2006. (*Id.* at 34:22–24.)

### 5.   *Mr. Pagan's Interview*

In a second Incident Report, dated January 30, 2007, Detective Sutton reports that he and Detective Willoughby interviewed Mr. Pagan and that Mr. Pagan stated "that he wasn't at Newt's Café on the night of the shooting and states that he hadn't been inside Newt's Café since November.   Pagan states that he heard about the shooting, but our

information was flawed because he wasn't there." (1/30/07 Sutton Report, Ex. I to Sutton's 56(a)1 Stmt at 2.)

       C.      Warrant and Arrest

On February 2, 2007, Detective Sutton prepared an Application for Arrest Warrant for the arrest of Mr. Pagan. (Warrant Application, Ex. W to Sutton's 56(a)1 Stmt.) In the Warrant Application, Detective Sutton stated that Rodrigo Ramirez, Danielle Adams, and Michael Anderson identified Mr. Pagan as the shooter in the incident outside Newt's Café on December 24, 2006. (*Id.* at 2–4.) Detective Willoughby testified during his deposition in this case that he did not discuss the contents of the affidavit with Detective Sutton. (Willoughby Dep. at 55:12–56:9.) He also testified that he did not meet with the state's attorney regarding the warrant for Mr. Pagan's arrest. (*Id.* at 57:2–6.) Detective Sutton testified during his deposition that he did not confer with any other detectives in preparing the affidavit for the Pagan arrest warrant. (Sutton Dep., Ex. C to Willoughby's 56(a)1 Stmt at 60:1–9.)

A warrant for Mr. Pagan's arrest issued (Ex. V to Sutton's 56(a)1 Stmt), and Detective Sutton arrested Mr. Pagan on February 2, 2007 (Ex. X to Sutton's 56(a)1 Stmt).

       D.      New Haven Police Department Training and Practices

Former Chief of Police Francisco Ortiz states in an affidavit that during his twenty–nine years with the New Haven Police Department he never received "any training or instruction to engage in any unlawful conduct or conduct which would result in the deprivation of an individual's Civil or Constitutional rights." (Ortiz Aff., Ex. D to Ortiz's Loc. R. 56(a)1 Stmt ¶ 6.) He further avers that in December 2006 through February 2007, the Police Department "did not condone any conduct by its officers resulting in the

8

deprivation of an individual's Civil or Constitutional rights, nor did it condone such conduct at anytime prior, while I was a member of the department," nor did it "have any policy or practice of depriving an individual of his Civil or Constitutional rights, nor did it have any such policy or practice at anytime prior, while I was a member of the department." (*Id.* ¶¶ 7–8.) Chief Ortiz also states:

> At no time from March of 2003 through February of 2007, during which time I held the positions of acting Chief of Police and later Chief of Police, did I receive any complaint concerning unlawful witness interrogation and/or photo identification practices within my department.
>
> At no relevant time, did I know or have any reason to know of any improper or unlawful witness interrogation and/or photo identification practices utilized by officers under my command, including Detectives Clarence Willoughby and Reginald Sutton.

(*Id.* ¶¶ 11–12.) Chief Ortiz similarly testified during his deposition in this case that during his time as acting Chief, he was never made aware of any problems with witness interrogations or photo identifications in the department. (Ortiz Dep., Ex. 1 to City's 56(a)1 Stmt at 100:9–19.)

Detective Willoughby testified at his deposition that during his time as a detective with the New Haven police department, he received training on how to do a homicide investigation, how to prepare a case, how to prepare an affidavit, the constitutional limitations with respect to interrogating suspects, and how to present a photo board to a witness. (Willoughby Dep., Ex. 2 to City's 56(a)1 Stmt at 10:15–14:25.) He was asked if he received training on the constitutional law regarding interviewing witnesses and answered: "I think we had classes on that, but I don't recall." (*Id.* at 13:15–23.) Detective Willoughby

also testified that with respect to the Pagan investigation, he did not violate any of the Constitutional dictates that he was taught. (*Id.* at 96:3–6.)

Detective Sutton testified that he received training on interviewing and interrogation, along with training on Constitutional law. (Sutton Dep., Ex. 3 to City's 56(a)1 Stmt at 8:17–21, 71:20–73:5.) He also testified that he was not ever taught unlawful interrogation tactics, to use coercion in interviewing witnesses, or to coach witnesses to have them say what he wanted. (*Id.* at 73:6–74:5.) Detective Sutton further stated that he had not ever manufactured evidence against a suspect, nor was he ever taught to manufacture evidence, to falsify an arrest warrant, or to ignore exculpatory evidence against a suspect. (*Id.* at 74:6–21.)

A March 19, 2008 New Haven Register article reported that Connecticut Superior Court Judge Richard Damiani had granted a motion to dismiss in a first–degree manslaughter case against Errie McClendon. (Ex. 10 to Pl.'s 56(a)2 Stmt.) The article reports that Mr. McClendon's attorney, John W. Watson, stated that Detective Willoughby was the lead detective in the case, which "affected things," because "[w]itnesses claim to have been prompted. They directly contradicted what they had said to police." (*Id.*) A March 25, 2008 New Haven Register article repeated Attorney Watson's claims regarding Detective Willoughby, and referred to the Pagan criminal trial along with the McClendon case stating: "Two homicide prosecutions have collapsed recently, leaving them and a related shooting unresolved. In both cases, the role of now–retired police Detective Clarence Willoughby was a factor." (*Id.*) In a separate criminal case, against Kwame Wells–Jordan, three witnesses testified at trial that Detective Willoughby told them to implicate Mr. Wells–Jordan in taped

10

statements. (4/23/08 Wells–Jordan Trial Tr., Exs. 11 and 12 to Pl.'s 56(a)2 Stmt at 162:9–13, 206:15–207:12; 4/30/08 Wells–Jordan Trial Tr., Ex. 13 to Pl.'s 56(a)2 Stmt at 22:6-25:13.)

II.     Discussion[2]

        A.      Detective Sutton

Detective Sutton moves for summary judgment in his favor on Mr. Pagan's claims sounding in unlawful arrest (Counts One and Three) on the ground that there was probable cause for Mr. Pagan's arrest, thereby barring these claims. Mr. Pagan argues that in light of the testimony of Mr. Ramirez, Ms. Adams, and Mr. Anderson regarding the coercion and influence exercised by Detectives Willoughby and Sutton in procuring their identifications of Mr. Pagan as the shooter, there exist genuine issues of material fact as to the existence of probable cause to arrest him.

        "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotation marks and citations omitted). "Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.*

---

[2] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

"Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (internal citations omitted). Plaintiff can meet this burden with respect to Detective Sutton if he shows that Detective Sutton "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, where such false or omitted information was necessary to the finding of probable cause." *Frey v. Maloney*, 476 F. Supp. 2d 141, 151 (D. Conn. 2007) (quoting *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)) (alterations omitted). This inquiry invokes the "corrected affidavits doctrine," under which the Court must "put aside allegedly false material [and] supply any omitted information" in order to "construct what a hypothetical, 'corrected' warrant application would contain, based on the facts as they were known to the applicant"; the Court must then decide "whether this corrected affidavit would support probable cause to arrest." *Id.* (quoting *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999); *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997)).

Here, in their testimony at the *Franks* hearing, and/or during Mr. Pagan's criminal jury trial, Rodrigo Ramirez, Danielle Adams, and Michael Anderson not only recanted their identifications of Mr. Pagan as the shooter, but also claimed that they only identified Mr. Pagan when interviewed by the detectives because Detective Willoughby, either with Detective Sutton's assistance or, at a minimum, in his presence, pressured them to identify Mr. Pagan as the shooter.

Detective Sutton argues that probable cause was established by the information provided by Ramirez, Adams, and Anderson, and that "plaintiff has failed to demonstrate a single falsehood in the warrant affidavit, let alone one known to Detective Sutton when he prepared it," claiming that "[t]he fact that all three declined to testify later in a manner consistent with their statements and photo identifications is immaterial to plaintiff's rebuttal argument" (Sutton Reply [Doc. # 92] at 9.)   These witnesses did not simply testify inconsistently with their statement and photo identifications, however; they testified that the only reason they provided those statements in the first place was that they were pressured by Detective Willoughby, in the presence of Detective Sutton.   If a jury were to credit the accounts of Ramirez, Adams, and Anderson, it could reasonably find that their supposed "identifications" were, in fact, false, and that Detective Sutton knew they were false at the time he submitted his affidavit in an effort to secure a warrant to arrest Mr. Pagan.

Applying the corrected affidavits doctrine, the Court must therefore disregard these three identifications upon which Detective Sutton relied.   *See Frey*, 476 F. Supp. 2d at 151. The only identifications of Mr. Pagan as the shooter that remain in this "corrected" affidavit are rumors "[o]n the streets" that Mr. Pagan shot Tony Howell and James Brown.   (Warrant Application at 1.)   This is not "reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins*, 478 F.3d at 84. The record therefore contains facts from which a reasonable juror could conclude that Mr. Pagan has met his heavy burden and that the warrant for his arrest issued on less than probable cause.

13

Detective Sutton's argument that the Court should give preclusive effect to the Superior Court's decision to admit the Ramirez, Adams, and Anderson identifications in Mr. Pagan's criminal trial is similarly unavailing.  Having been acquitted in his criminal case, Mr. Pagan had no basis for seeking appellate review of the decision to admit those identifications.  A decision made in the course of a pretrial suppression hearing "cannot be given preclusive effect against a defendant subsequently acquitted of the charges.  This rule is predicated on the defendant's lack of an opportunity to obtain review of an issue decided against him."  *Jenkins*, 478 F.3d at 92.  Because Mr. Pagan's inability to appeal the decision to admit the identifications deprived him of the full and fair opportunity to litigate this issue, this Court will not give that decision any preclusive effect.

Detective Sutton also argues in his Reply that he is entitled to summary judgment on Mr. Pagan's fair trial claim (Count Three), as distinguished from his false arrest claim (Count One), because "[b]eyond the deprivation of liberty that occurred when [Mr. Pagan] was arrested by warrant, the only harm that could have flowed [from the photo identifications and recorded statements] would have been a criminal conviction.  Plaintiff was acquitted, and therefore his 'fair trial' claim is not viable."  (Sutton Reply at 11.)  "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  As discussed above, a reasonable jury could conclude that Detective Sutton created false information and forwarded to prosecutors in connection with Mr. Pagan's arrest and criminal trial.  Although Mr. Pagan was acquitted, he was nonetheless subjected to a criminal

14

trial, and the stress, risks, and costs associated with that trial, on the basis of allegedly false information.  A reasonably jury could therefore conclude that he suffered harm as a result of Detective Sutton's violation of his right to a fair trial through the false identifications.

Detective Sutton's motion for summary judgment on Counts One and Three is therefore denied.

B.     Detective Willoughby

Detective Willoughby argues that he is entitled to summary judgment in his favor on Counts One and Three of Mr. Pagan's Complaint because he "did not prepare, assist in the preparation of, discuss or consult" with Detective Sutton in connection with the application for the warrant for Mr. Pagan's arrest (Willoughby Mem. Supp. [Doc. # 74–1] at 8), and because in any event he "did not have a reasonable opportunity to intervene" to stop Mr. Pagan's arrest because he had no role in the submission of the application for the warrant (*id.* at 12).

An officer can be held liable for false arrest where he did not prepare any affidavit submitted in connection with an application for an arrest warrant or participate in the arrest itself.  *See Mitchell v. City of Hartford*, 674 F. Supp. 60, 67 (D. Conn. 1986) (denying summary judgment on false arrest claim against defendant Fallon where Fallon provided to Peters, the officer who prepared the warrant application, the plaintiff's name and photograph and where "it could conceivably be proven by plaintiff at trial that when Fallon provided Peters with Mitchell's name and photograph, Fallon knew that Peters would apply for an arrest warrant of Mitchell and was aware that the information provided on the warrant would be false").  Here, as discussed above, Mr. Ramirez, Ms. Adams, and Mr. Anderson have each testified that Detective Willoughby pressured them into identifying Mr. Pagan as

15

the man who shot Tony Howell and James Brown outside Newt's Café, and that Detective Willoughby's pressure was the only reason they identified Mr. Pagan. Detective Sutton then used this information in obtaining the warrant for Mr. Pagan's arrest. From these facts a reasonably jury could readily conclude that Willoughby applied this pressure to the witnesses fully understanding that their identifications would be used by Detective Sutton in connection with an application for an arrest warrant. Detective Willoughby, therefore, is not entitled to summary judgment on the ground that he did not prepare or assist in the preparation of the warrant application.

With respect to Detective Willoughby's argument that he did not have the opportunity to intervene to stop any constitutional violation, "[a] law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Here, a reasonable jury could conclude from the testimony of Ramirez, Adams, and Anderson that Detective Willoughby affirmatively participated in the constitutional violation by pressuring those witnesses to falsely identify Mr. Pagan as the shooter at Newt's Café, knowing that Detective Sutton would likely use those identifications in his application for an arrest warrant. A reasonable jury could similarly conclude that through his participation in obtaining these identifications, Detective Willoughby had an opportunity to intercede on Mr. Pagan's behalf simply by halting his

interview tactics, or asking Detective Sutton not to use the identifications obtained through such tactics.

Detective Willoughby's motion for summary judgment on Counts One and Three is therefore denied.

C.     The City of New Haven and Chief Ortiz

The City argues that it is entitled to summary judgment in its favor on Mr. Pagan's failure to provided adequate training and supervision (Count Four) and deliberate indifference (Count Five) claims on the ground that Mr. Pagan's evidence in support of these claims consists of "nothing more than conclusory allegations as to training" and "contemporaneous and subsequent legal proceedings." (City Mem. Supp. [Doc. # 79] at 7.)

A municipality may be liable under Section 1983 "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). An official municipal policy or custom can be established by showing a deliberate policy of failing to train or supervise officers where that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)).

Where there is no written directive or regulation that establishes the alleged policy of failing to train, it "may be inferred from the informal acts or omissions of supervisory municipal officials" where those acts are so severe as to "constitute 'gross negligence' or

17

'deliberate indifference' to a plaintiff's rights." *Sarus v. Rotundo*, 831 F.2d 397, 400–01 (2d Cir. 1987).  A plaintiff must accordingly show:

> (1) that 'a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that 'the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.'

*Nicholson v. Scoppetta*, 344 F.3d 154, 166–67 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 904–04 (2d Cir. 1998).

Mr. Pagan acknowledges that the evidence that he claims demonstrates the City's failure to provide adequate training and supervision and its deliberate indifference consists of New Haven Register articles from 2008 in which the attorney for Errie McClendon states that witnesses "claim to have been prompted" by Detective Willoughby in the criminal case against him and the transcripts of the criminal trial against Kwame Wells–Jordan in which three witnesses testified that Detective Willoughby instructed them to implicate Mr. Wells–Jordan.  His counsel claimed at oral argument that from these contemporaneous cases, along with the fact that Detective Willoughby had been with the New Haven Police Department for a "long period of time," that he had claimed he solved "100%" of his cases, and that he was frequently assigned to high profile investigations, a reasonable jury could draw an inference that the City and Chief Ortiz had notice of Willoughby's interrogation techniques.

The Supreme Court recently held that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates" as is required in a deliberate indifference

or failure to train claim against a municipality, *Connick v. Thompson*, – U.S. —, 131 S. Ct. 1350, 1360 n.7 (2011).  At best, the conduct in the McClendon and Wells–Jordan matters was contemporaneous with Detective Willoughby's actions in investigating the case against Mr. Pagan.  Mr. Pagan therefore cannot point to any evidence from which a reasonable jury may permissibly conclude that the City was aware of constitutional violations by its detectives in their investigative practices or that it failed to properly train those detectives.

Mr. Pagan's claims against Chief Francisco Ortiz (Count Six for failure to adequately supervise and failure to intercede) fail for the same reasons as his claims against the City. As with his claims against the City, Mr. Pagan relies on Detective Willoughby's actions in connection with the McClendon and Wells–Jordan cases as evidence of a "pattern of misconduct" for which his supervisor, Chief Ortiz, may be found liable.  This is not evidence upon which a reasonable jury may base a conclusion that Ortiz was aware or should have been aware of constitutional violations.

The City's motion for summary judgment on Counts Four and Five, and Chief Ortiz's motion for summary judgment on Count Six are therefore granted.

III.     Conclusion

For the reasons stated above, Defendant Willoughby's motion for summary judgment [Doc. # 74] and Defendant Sutton's motion for summary judgment [Doc. # 76] are DENIED; Defendant Ortiz's motion for summary judgment [Doc. # 75] and the City of New Haven's motion for summary judgment [Doc. # 77] are GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of July, 2012.